******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TRAVELERS CASUALTY AND SURETY COMPANY
OF AMERICA ET AL. *v.* THE NETHERLANDS
INSURANCE COMPANY ET AL.
(SC 19089)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued February 25—officially released August 5, 2014*

*Susan L. Miller*, with whom was *Margaret A. Casey*,
for the appellants (named defendant et al.).

*Jane I. Milas*, with whom was *Anita C. DiGioia*,
for the appellee (defendant Lombardo Brothers Mason
Contractors, Inc.).

*Lee H. Ogburn*, pro hac vice, with whom, on the brief,
was *Laura Pascale Zaino*, for the appellees (plaintiffs).

*Opinion*

ROBINSON, J. The plaintiffs, Travelers Casualty and Surety Company of America and Travelers Indemnity Company (collectively, Travelers), brought this declaratory judgment action against the defendants, who include The Netherlands Insurance Company (Netherlands) and Lombardo Brothers Mason Contractors, Inc. (Lombardo).[1] Travelers sought and received a judgment from the trial court declaring, inter alia, that Netherlands was obligated to defend Lombardo, and pay to Travelers its pro rata share of the costs incurred in defending Lombardo in the civil action arising from Lombardo's role in the construction of the leak prone library at the University of Connecticut School of Law (law library), chronicled in our recent decision in *State* v. *Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 420– 21, 54 A.3d 1005 (2012) (underlying action). Netherlands appeals[2] from that declaratory judgment, and raises a plethora of appellate issues, namely, that the trial court improperly: (1) concluded that Travelers had standing to bring this action because it was not a party to the commercial general liability insurance policies (CGL policies) that Netherlands had issued to Lombardo; (2) determined that the allegations recited in the complaint in the underlying action (underlying complaint), constituted an occurrence under the CGL policies; (3) concluded that the exclusion for "known injury or damage" in the CGL policies did not preclude coverage; (4) found that the pro rata allocation period for defense costs was 144 months; (5) denied Netherlands' motion for permission to amend its answer and special defenses to assert the special defense of unclean hands; and (6) prohibited it from presenting evidence of unclean hands. We disagree and, accordingly, we affirm the judgment of the trial court.

The record reveals the following background facts, as set forth in the trial court's memorandum of decision, and procedural history. "In 1994, the state of Connecticut (state) contracted with Lombardo to perform masonry for the construction of the [law library], which was completed in 1996. In the underlying complaint, the state alleges that in the months and years following the completion of the project, the state began to experience problems with water intrusion in the [law] library. Over the years, the alleged water intrusion proved to be continuing and progressive, to the point where the state retained forensic engineers to investigate the full extent and likely cause of the problem. On February 14, 2008, the state initiated a lawsuit against Lombardo and other entities seeking to recover approximately $18 million that it alleged was necessary to repair defects in the law library.[3]

"From 1994 to 2008, the following insurance carriers assumed Lombardo's risk: September 30, 1994 to August 31, 1998, Travelers, [CGL] Policies; August 31, 1998 to

August 31, 2000, Lumbermens [Insurance Company (Lumbermens)], [CGL] Policies; August 31, 2000 to June 30, 2006, Netherlands, [CGL] Policies and Peerless [Insurance Company (Peerless)], umbrella general liability policies.

"In late 2005, Lombardo notified its insurance carriers of the state's potential claim against it and Travelers agreed to participate in the investigation and related defense. Lumbermens . . . and Netherlands refused, however, to participate in the investigation and defense. Prior to trial, Travelers spent over $482,855 defending Lombardo." (Footnotes altered.)

In July, 2009, Travelers filed a two count complaint against Netherlands, Peerless, Lumbermens and Lombardo.[4] In the first count, Travelers sought, inter alia, a declaratory judgment that: (1) Peerless, Netherlands[5] and Lumbermens "are obligated to pay their pro rata shares of the cost of Lombardo's defense"; and (2) "Lombardo is required to pay the pro rata share of its defense costs allocated to any uninsured period in the underlying action going forward . . . ." In the second count, alleging "equitable subrogation," Travelers alleged that it had paid the full cost of defending Lombardo, and sought reimbursement from Netherlands and Lumbermens of their pro rata share of the defense costs with respect to the underlying claim and underlying action. In response, Netherlands filed an answer and five special defenses wherein it contended that coverage was unavailable under both the primary CGL policies issued by Netherlands and the umbrella policies issued by Peerless.

With respect to the special defense that is at issue in this appeal, Netherlands pleaded that it had no obligation to reimburse defense costs because Lombardo had been on notice of problems with the law library "on or before January, 2000," and, therefore, prior to the issuance of the first Netherlands CGL policy in August, 2000, meaning that "the exclusion for prior known occurrences or claims . . . applies and no coverage is available for Lombardo under any of the policies listed in paragraph 1a of this first special defense."[6]

The matter proceeded to a one day court trial before the court, *Hon. Joseph Q. Koletsky*, judge trial referee.[7] At trial, Travelers withdrew the second count of its complaint claiming a right to equitable subrogation. Shortly thereafter, Netherlands moved to dismiss this case for lack of subject matter jurisdiction, claiming that Travelers, which was not a party to Lombardo's insurance contracts, now lacked standing to assert the remaining declaratory judgment claim in the complaint. The trial court denied that motion to dismiss, concluding that Travelers had standing to bring this declaratory judgment action.

The trial court then issued a memorandum of decision

rendering judgment for Travelers, declaring that: "Netherlands had a duty to defend based on the underlying complaint." In reaching this conclusion, the trial court first determined that the factual allegations in the underlying complaint "state that the damage potentially falls within the dates of Netherlands' coverage."[8] The trial court held that the "occurrence which triggered the duty to defend was the water intrusion into the law library,"[9] and rejected Netherlands' reliance on the known injury or damage clause, noting that "the underlying complaint does not state with certainty when Lombardo was aware of the actual damage."[10] In a subsequent articulation; see Practice Book § 66-5; the trial court found that Netherlands was obligated to pay 48.6 percent of Lombardo's defense costs, which it determined by dividing the 70 month coverage period, from August 31, 2000 to June 30, 2006, "by the entire allocation period of 144 months." This appeal followed.

On appeal, Netherlands claims that the trial court improperly: (1) denied its motion to dismiss this declaratory judgment action; (2) concluded that the facts recited in the underlying complaint constituted an occurrence under the CGL policies; (3) concluded that the exclusion for "known injury or damage" in the CGL policies did not preclude coverage; (4) determined that the allocation period for the insurers' pro rata share of the defense costs was 144 months; (5) denied its motion for permission to amend the answer and special defenses to assert the special defense of unclean hands; and (6) precluded it from introducing evidence of unclean hands. We address each claim in turn, setting forth additional relevant facts and procedural history where necessary.

I

MOTION TO DISMISS

We begin with Netherlands' claim that the trial court improperly denied its motion to dismiss this declaratory judgment action and, specifically, the first and only remaining count in the complaint, for lack of subject matter jurisdiction. Netherlands relies on *Wilson* v. *Kelley*, 224 Conn. 110, 116, 617 A.2d 433 (1992), as standing for the proposition that General Statutes § 52-29,[11] the declaratory judgment statute, does not create an independent cause of action or "substantive rights that did not otherwise exist." Citing, inter alia, *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 833 A.2d 908 (2003), Netherlands contends that the first count alleges breach of contract between it and Lombardo and that, because Travelers is neither a party to Netherlands' insurance contracts with Lombardo nor an intended third party beneficiary thereof, Travelers lacks standing to bring this claim. To this end, Netherlands cites a Superior Court decision, *Century Indemnity Co.* v. *Northeast Utilities*, Superior Court, judicial district of New Britain, Docket No. CV-98-0495496-S

(May 24, 1999), as holding that "an insurer does not have standing to sue to enforce insurance contracts between its insured and other insurers, although, under certain circumstance[s], it may have a claim for equitable contribution." Thus, Netherlands contends that Travelers "deprived itself" of standing when it withdrew its equitable claims at trial.

In response, Travelers, joined by Lombardo, first contends that subject matter jurisdiction exists because it withdrew the equitable subrogation claim for the sole reason that the parties had agreed that the case would be tried only under the first count, seeking only a percentage determination as to the parties' pro rata responsibility for defense; the parties agreed to this litigation posture because attorney-client privilege issues arising from the pending underlying action precluded the discovery necessary to arrive at a money judgment on the equitable subrogation count. Citing three other Superior Court decisions,[12] Travelers then claims that it is classically aggrieved, which gives it the requisite standing to bring a declaratory judgment action under § 52-29 and the implementing rule of practice, Practice Book § 17-55,[13] with respect to the duty to defend as between carriers with a mutual insured. Although Travelers is neither a party to, nor an intended beneficiary of, an insurance policy between Lombardo, its insured, and Netherlands, they argue that Travelers' aggrievement is established by the fact that it has paid all of Lombardo's defense costs to date and that Netherlands has refused to defend Lombardo or contribute to the defense costs incurred by Travelers. Further, as a policy matter, Lombardo observes that it "is not unusual that an insured against whom a large claim has been made is often not in the best financial position to bring and prosecute a declaratory judgment action against multiple insurers," and states that it, of course, has a "very real interest . . . with respect to the responsibilities of the various carriers to provide a defense," given the ongoing litigation in the underlying action. We agree with Travelers and Lombardo, and conclude that the trial court properly denied the motion to dismiss because Travelers had standing to bring this declaratory judgment action.

The record reveals the following additional relevant facts and procedural history. On the day of the court trial in this case, counsel for Travelers explained that it was withdrawing the second count of the complaint, which sought a money judgment requiring, inter alia, Netherlands "to pay to Travelers [Netherlands'] pro rata share of the sums paid by Travelers to defend Lombardo against the underlying claim from February 25, 2003, forward and against the underlying action," because of attorney-client privilege issues with respect to Lombardo that resulted from the still pending underlying action.[14] Counsel for Travelers explained that, should the court agree with its argument that Netherlands was obligated to pay 48.6 percent of Lombardo's defense

costs, the parties "will, between us, sort out what 48.6 percent of those bills is." Counsel for Netherlands confirmed that understanding,[15] although a subsequent discussion with the trial court appeared to raise the question of whether the requested declaration of a percentage would be appropriately rendered under the first count, rather than the withdrawn second count.[16] Further action was not taken at that point, after Netherlands' counsel stated her belief that the request for a declaratory judgment in the first count was an "equitable action," particularly insofar as Netherlands' pending request to amend the special defenses to assert an equitable defense of unclean hands pertained to both counts of the complaint.

After the one day court trial, Netherlands moved to dismiss for lack of subject matter jurisdiction, claiming that Travelers' withdrawal of the equitable subrogation count deprived it of standing to assert the sole remaining declaratory judgment claim in the complaint because Travelers was not a party to Lombardo's insurance contracts with Netherlands and Peerless. The trial court denied the motion to dismiss, concluding that Travelers had standing to proceed in this declaratory judgment action under the factors set forth in Practice Book § 17-55 and *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 218 Conn. 335, 346–47, 589 A.2d 356 (1991). Relying primarily on the application of those factors in *Travelers Property Casualty Co. of America* v. *Continental Casualty Co.*, judicial district of New London, Docket No. CV-08-4008325-S (December 29, 2008) (47 Conn. L. Rptr. 18, 20–21), the trial court held that Travelers had standing to bring this declaratory judgment action because: "Netherlands' denial of Lombardo's claim obligated Travelers to defend Lombardo, thereby injuriously affecting Travelers more than members of the general community. Travelers also has a very practical interest in a declaration of Netherlands' obligations under its policy; it could require or compel Netherlands to participate in Lombardo's defense."

"The purpose of a declaratory judgment action, as authorized by . . . § 52-29 and Practice Book § [17-55], is to secure an adjudication of rights [when] there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties. . . . Subdivisions (1) and (2) of Practice Book § 17-55 respectively require that the plaintiff in a declaratory judgment action have an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations and that there be an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties . . . . This court previously has observed that our declaratory judgment statute provides a valuable tool by which litigants may resolve uncertainty of legal obligations.

. . .

"We also have recognized that our declaratory judgment statute is unusually liberal. An action for declaratory judgment . . . is a statutory action as broad as it well could be made. . . . Indeed, our declaratory judgment statute is broader in scope than . . . the statutes in most, if not all, other jurisdictions . . . and [w]e have consistently construed our statute and the rules under it in a liberal spirit, in the belief that they serve a sound social purpose. . . . [Although] the declaratory judgment procedure may not be utilized merely to secure advice on the law . . . it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof. . . .

"One type of controversy to which our declaratory judgment statute often has been applied is a dispute over rights and liabilities under an insurance policy." (Citations omitted; internal quotation marks omitted.) *New London County Mutual Ins. Co.* v. *Nantes*, 303 Conn. 737, 747–48, 36 A.3d 224 (2012); see also *St. Paul Fire & Marine Ins. Co.* v. *Shernow*, 22 Conn. App. 377, 380, 577 A.2d 1093 (1990) ("[t]here is no question that a declaratory judgment action is a suitable vehicle to test the rights and liabilities under an insurance policy").

"It is a basic principle of our law . . . that the plaintiffs must have standing in order for a court to have jurisdiction to render a declaratory judgment. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . [Because] [s]tanding requires no more than a colorable claim of injury . . . a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests." (Citation omitted; internal quotation marks omitted.) *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 758, 6 A.3d 726 (2010).

Put differently, an "action for a declaratory judgment, valuable as it has become in modern practice, is not a procedural panacea for use on all occasions. . . . In providing statutory authority for courts to grant declaratory relief, the legislature did not intend to broaden

their function so as to include issues which would not be such as could be determined by the courts in ordinary actions. . . . The declaratory judgment procedure consequently may be employed only to resolve a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement. . . . A party pursuing declaratory relief must therefore demonstrate, as in ordinary actions, a justiciable right in the controversy sought to be resolved, that is, contract, property or personal rights . . . as such will be affected by the [court's] decision . . . . A party without a justiciable right in the matter sought to be adjudicated lacks standing to raise the matter in a declaratory judgment action." (Citations omitted; internal quotation marks omitted.) *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, supra, 218 Conn. 347–48.

Thus, "[s]tanding is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 214–15, 982 A.2d 1053 (2009).

Finally, it is well settled that "[i]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary." (Internal quotation marks omitted.) *Bysiewicz* v. *DiNardo*, supra, 298 Conn. 758–59.

The question in this appeal, then, is whether an entity that is not a named insured or otherwise party to certain insurance policies may demonstrate "a specific, personal and legal interest in [those] policies" that would give it standing to commence a declaratory judgment action. *Wilcox* v. *Webster Ins., Inc.*, supra, 294 Conn. 215. This requires us to address the split of authority

that arises from the "potential problem [when] a declaratory judgment is sought by one of the insurers against the other, since the two entities are not in the usual course of events in any cognizable legal relationship with each other."[17] 16 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2005) § 227:42, pp. 227-58 through 227-59. We agree, however, with the vast majority of federal and sister state authorities that have considered this question, which support the leading commentators' view that it is "properly within the competent authority of a court to hear [an action for] declaratory judgment . . . relating to the rights and obligations of two insurance companies as to the coverage of their respective policies, where the pleadings embrace and present this ultimate and controlling issue."[18] Id., § 232:63, p. 232-85. This includes questions as to the insurers' duty to defend. See id., § 232:65, p. 232-90. Indeed, federal case law is especially persuasive because "[o]ur rules of practice, [mirror] the federal constitutional 'case or controversy' requirement . . . ." (Citation omitted.) *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, supra, 218 Conn. 346–47, citing *Flast* v. *Cohen*, 392 U.S. 83, 95, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968).

There are two lines of federal authority on this issue supporting the general proposition that, when a coverage dispute arises, one insurer has the standing to bring a declaratory judgment action against another insurer in order to determine the existence or allocation of a duty to defend a common insured party, despite the fact that they are not parties to each other's insurance policies with that common insured. One line of cases, exemplified by the decision of the United States Court of Appeals for the Eleventh Circuit in *Provident Life & Accident Ins. Co.* v. *Transamerica-Occidental Life Ins. Co.*, 850 F.2d 1489, 1492–93 (11th Cir. 1988), cert. denied, 489 U.S. 1081, 109 S. Ct. 1534, 103 L. Ed. 2d 839 (1989), conditions that standing on the creation of the requisite case and controversy via (1) the inclusion of the insured as a necessary party to the declaratory judgment action, or (2) a reservation of rights agreement between the two insurers, prior to one or both defending or indemnifying their common insured.[19] Although Travelers would have standing under *Provident Life & Accident Ins. Co.* because it named Lombardo as a defendant in this declaratory judgment action, we, however, find more persuasive the other line of cases, exemplified by *United Services Automobile Assn.* v. *Royal-Globe Ins. Co.*, 511 F.2d 1094, 1095–96 (10th Cir. 1975), which does not so require.

Accordingly, we turn to a detailed review of *United Services Automobile Assn.* v. *Royal-Globe Ins. Co.*, supra, 511 F.2d 1094, wherein the United States Court of Appeals for the Tenth Circuit persuasively rejected arguments akin to those of Netherlands in this appeal. That case was a declaratory judgment action brought

to determine whether the United Services Automobile Association (USAA), which was the insurer of a minor who had been involved in an accident while driving a rental car, was obligated to defend and indemnify that minor, as opposed to Royal-Globe Insurance Company (Royal), who was the rental company's insurer. Id., 1095. "Royal challenge[d] USAA's standing to bring [the] [declaratory judgment] action," noting that "USAA is not a direct beneficiary of the rental contract, Royal invokes the settled and familiar rule that an action by a third party to enforce a contract may be brought only when the third party is a direct beneficiary of the contract." Id., 1096. The Tenth Circuit rejected this argument "simply because this action is not one to enforce a contract but rather seeks a declaration of the relative rights and duties of USAA and Royal. The subject matter of the suit—the duty to defend and indemnify [the minor] in the pending Texas lawsuit— is definite and substantial. Each party has a stake in the outcome, and their interests are adverse." Id.; see also, e.g., *Phico Ins. Co.* v. *Providers Ins. Co.*, 888 F.2d 663, 667 (10th Cir. 1989) (concluding that insurance company had standing to bring declaratory judgment coverage action against insured's subsequent liability carrier, which had declined to defend and indemnify insured, even after they had agreed to contribute to settlement fund that was intended to avert bad faith claim by insured, given that "[e]ach party clearly had a stake in the outcome and their interests were adverse"); *American Southern Ins. Co.* v. *Buckley*, 748 F. Supp. 2d 610, 619 (E.D. Tex. 2010) (denying motion to dismiss, for lack of standing, counterclaim seeking declaratory judgment with respect to coinsurer's duty to defend because duty to defend is immediate and presented "redressable" harm as coinsurer "was injured by the expenditure of funds for which it has not been reimbursed," as declaration may give rise to subrogation or contribution); *Transportation Ins. Co.* v. *Pennsylvania Manufacturers' Assn. Ins. Co.*, 641 F. Supp. 2d 406, 411–12 (E.D. Pa. 2008) (rejecting claim that commercial liability insurer lacked standing to bring declaratory judgment action against its insured's subsequent carrier on ground that it "was neither a party to the [subsequent] insurance contract . . . nor an intended third party beneficiary" because "there is no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under other insurance clauses or under the equitable doctrine of contribution" [internal quotation marks omitted]), rev'd on other grounds, 346 Fed. Appx. 862 (3d Cir. 2009); *Fremont Indemnity Co.* v. *California National Physician's Ins. Co.*, 954 F. Supp. 1399, 1401 (C.D. Cal. 1997) ("actual controversy exists between [two medical malpractice insurers] making declaratory relief appropriate" in dispute about whether policy required defendant to defend their common insured); *Maryland Ins. Co.* v. *Attorneys' Liability Assurance Society, Ltd.*, 748 F. Supp. 627, 632 (N.D. Ill.

1990) (insured is not per se necessary party to create privity between coinsurers in declaratory judgment action).[20]

The cases following *United Services Automobile Assn.* v. *Royal-Globe Ins. Co.*, supra, 511 F.2d 1094, are more persuasive authority than the *Provident Life & Accident Ins. Co.* line of cases because they are more consistent with our state's existing case law.[21] Additionally, these cases are in accord with the classical aggrievement approach that this court follows when determining whether a party has standing to bring a declaratory judgment action. See, e.g., *Bysiewicz* v. *DiNardo*, supra, 298 Conn. 758; *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, supra, 218 Conn. 347–48. The contrasting requirement, imposed by cases such as *Provident Life & Accident Ins. Co.*, that the insured be joined for purposes of conferring standing is inconsistent with our own recent case law holding that "the failure to give notice to or to join an indispensable party does not impact the court's subject matter jurisdiction." *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 288, 914 A.2d 996 (2007); and with local federal case law standing for the proposition that, in the Second Circuit, "in suits between insurers concerning respective liabilities, the insured is not an indispensable party," when the "action . . . is strictly an inter-carrier dispute over priority of contribution to a settlement. [The insured's] interests are fully protected and it is in no danger of being left uncovered."[22] *Home Ins. Co.* v. *Liberty Mutual Ins. Co.*, 678 F. Supp. 1066, 1070 (S.D.N.Y. 1988), citing *Wyoming* v. *Ins. Co. of North America*, 518 F.2d 23 (2d Cir. 1975); see also *Royal Ins. Co. of America* v. *Caleb V. Smith & Son, Inc.*, United States District Court, Docket No. 3:90CV651 (WWE) (D. Conn. June 16, 1997) (rejecting argument that "the insured is *always* an indispensable party in a declaratory judgment action where the insurance carrier is contesting its obligation to provide coverage to the insured" [emphasis added]).

In support of its claim that Travelers lacked standing to bring this declaratory judgment action, Netherlands relies on our statement in *Wilson* v. *Kelley*, supra, 224 Conn. 116, that "a declaratory judgment action must rest on some cause of action that would be cognizable in a nondeclaratory suit." Netherlands then posits that Travelers lacked standing because the sole remaining count of the complaint essentially pleaded breach of contract between Netherlands and Lombardo, which is a legal claim; see, e.g., *Sovereign Bank* v. *Licata*, 116 Conn. App. 483, 508, 977 A.2d 228 (2009), appeal dismissed, 303 Conn. 721, 36 A.3d 662 (2012) (per curiam); and "one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract . . . ." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield*

*Development Corp.*, supra, 266 Conn. 579. We disagree. Even if the first count of Travelers' complaint implies that Netherlands is breaching its contractual duty to defend Lombardo,[23] the quoted portion of *Wilson* does not require that the cause of action underlying the declaratory judgment action be justiciable if brought as a nondeclaratory suit. Rather, we agree with Travelers' argument that, consistent with the often prospective nature of declaratory relief, this phrase is simply a reference point that is utilized to avoid "convert[ing] our declaratory judgment statute and rules into a convenient route for procuring an advisory opinion on moot or abstract questions . . . ." (Citations omitted.) *Wilson* v. *Kelley*, supra, 116; see also id. ("if a statute of limitations would have barred a claim asserted in an action for relief other than a declaratory judgment, then the same limitation period will bar the same claim asserted in a declaratory judgment action").

Specifically, the meaning of this aspect of *Wilson* is illustrated by our decision in *Bysiewicz* v. *DiNardo*, supra, 298 Conn. 759–60, considering this passage and concluding that a candidate for the Office of Attorney General had the requisite standing to seek a declaratory judgment with respect to whether she had the statutory qualifications to hold that office. Our conclusion was grounded by the facts that, should the candidate ultimately be elected, her qualifications could be tested by a quo warranto action, and our determination that "her declared intention to run for the [O]ffice of [A]ttorney [G]eneral and her particular interest in avoiding the great effort and expense of running for that office if her qualifications to serve in that office could be successfully challenged upon her election are sufficient to confer standing on her to bring this action." Id., 760. In *Bysiewicz*, a quo warranto action would not have been justiciable when the declaratory judgment action was brought—it would not have been ripe because the candidate had not yet been elected to office, and, the candidate, of course, would have lacked the requisite aggrievement to test her own entitlement to office via that writ. Thus, this phrase from *Wilson* stands only for the proposition that a declaratory judgment action must be supported by sufficient controversy so as to not amount to an advisory opinion.

Turning to the facts of this case, the controversy is real and ongoing, with Travelers' claim of injury more than colorable, given the nature of this coverage dispute and its averment that it "is bearing more than its fair share of Lombardo's defense" because of Netherlands' refusal to contribute to Lombardo's defense. See *New London County Mutual Ins. Co.* v. *Nantes*, supra, 303 Conn. 749–50. Indeed, the nature of the declaratory relief sought in the first count of the complaint is rendered nonadvisory by the fact that it implicates several cognizable causes of action, including a breach of contract action by Lombardo and an action by Travelers

seeking equitable contribution[24]—causes that are closely related, despite the fact that one is legal, and the other equitable, in nature. See *Continental Casualty Co.* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, 940 F. Supp. 2d 898, 918–19 (D. Minn. 2013) (describing relationship between insurer's action for equitable contribution and insured's rights under contract). Accordingly, we conclude that the trial court properly determined that Travelers had standing to bring this declaratory judgment action against Netherlands.

## II

### COVERAGE CLAIMS

We next turn to Netherlands' claim that the trial court improperly determined that it has a duty to defend Lombardo under the CGL policies. Specifically, Netherlands claims that: (1) the underlying complaint does not allege an occurrence with resulting property damage during the relevant policy periods; and (2) the "known injury or damage" exclusion relieves it of any obligation to defend.

Before turning to Netherlands' specific claims we note the following general principles governing the insurer's duty to defend. Under the well established "four corners" doctrine, "the duty to defend is broader than the duty to indemnify. . . . An insurer's duty to defend is triggered if at least one allegation of the complaint falls even possibly within the coverage. . . . Indeed, [i]t is well established . . . that a liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered. . . . The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to defend, irrespective of the insured's ultimate liability. . . . In contrast to the duty to defend, the duty to indemnify is narrower: while the duty to defend depends only on the allegations made against the insured, the duty to indemnify depends upon the facts established at trial and the theory under which judgment is actually entered in the case. . . . Thus, the duty to defend is triggered whenever a complaint alleges facts that potentially could fall within the scope of coverage . . . ."[25] (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 805–806, 67 A.3d 961 (2013); see also *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, 274 Conn. 457, 463, 876 A.2d 1139 (2005); *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, 256 Conn. 343, 352, 773 A.2d 906 (2001); *Keithan* v. *Massachusetts Bonding & Ins. Co.*,

159 Conn. 128, 139, 267 A.2d 660 (1970); *Missionaries of the Co. of Mary, Inc.* v. *Aetna Casualty & Surety Co.*, 155 Conn. 104, 113, 230 A.2d 21 (1967).

Further, "[a]n insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes. . . . [U]nambiguous terms are to be given their plain and ordinary meaning. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide. . . .

"If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation. . . . If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact. . . .

"Ordinarily, if an ambiguity arises that cannot be resolved by examining the parties' intentions . . . the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract. . . . Courts in such situations often apply the contra proferentem rule and interpret a policy against the insurer. . . . The contra-insurer rule does not apply, however, in actions by one insurer against another." (Citations omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 305–306, 765 A.2d 891 (2001). "[B]ecause the proper construction of a policy of insurance presents a question of law, the trial court's interpretation of the policy is subject to de novo review on appeal." (Internal quotation marks omitted.) *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, supra, 256 Conn. 352.

Finally, we note the following relevant policy provisions at issue, contained in the CGL policies that Netherlands issued to Lombardo for policy terms commencing on August 31, 2000 through June, 30, 2001, and renewed annually thereafter for five years from June 30, 2001 through June 30, 2006:[26]

"Section I—Coverage . . .

"1. Insuring Agreement

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result. . . .

* * *

"b. This insurance applies to 'bodily injury' and 'property damage' only if:

"(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory';

"(2) The 'bodily injury' or 'property damage' occurs during the policy period; and

"(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II—Who Is An Insured and no 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part. If such a listed insured or authorized 'employee' knew, prior to the policy period, that the 'bodily injury' or 'property damage' occurred, then any continuation, change or resumption of such 'bodily injury' or 'property damage' during or after the policy period will be deemed to have been known prior to the policy period.

"c. 'Bodily injury' or 'property damage' which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II—Who Is An Insured or any 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, includes any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period.

"d. 'Bodily injury' or 'property damage' will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II—Who Is An Insured or any 'employee' authorized by you to give or receive notice of an 'occurrence' or claim:

"(1) Reports all, or any part, of the 'bodily injury' or 'property damage' to us or any other insurer;

"(2) Receives a written or verbal demand or claim for damages because of the 'bodily injury' or 'property damage'; or

"(3) Becomes aware by any other means that 'bodily injury' or 'property damage' has occurred or has begun to occur."

A

Occurrence or Property Damage during Policy Period

We begin with Netherlands' claim that the underlying complaint does not allege an occurrence with resulting property damage during its policy periods. Netherlands posits that its "coverage began over four years after the construction was completed, and the water intrusion and property damage allegedly began. The damage alleged occurred well before [Netherlands'] coverage period. Since the alleged damage began and was ongo-

ing and continuous, prior to the inception of Netherlands' . . . policies, the damages alleged are not covered . . . ." Netherlands argues that a reading of "the [underlying] complaint in its entirety and not just particular paragraphs in isolation provide the basis for the analysis of the duty to defend," and that a reading of the "general allegations as well as the specific allegations directed at Lombardo" demonstrate that the "property damage manifested prior to the inception of Netherlands' . . . policies . . . ." Netherlands further argues that the trial court improperly characterized the water intrusion over the years following construction, "seemingly treating each water intrusion as a new event"; Netherlands instead contends that the "water intrusion, from its first appearance to its last, is the same occurrence." To this end, Netherlands cites *Quanta Indemnity Co.* v. *Davis Homes, LLC*, 606 F. Supp. 2d 941 (S.D. Ind. 2009), as standing for the proposition that the "fact that the property damage progressed and took different forms over time does not trigger subsequent policies."

In response, Travelers contends that the underlying complaint alleges property damage during the six Netherlands policy periods, from August 31, 2000 to June 30, 2006, insofar as the " 'property damage,' was caused by the 'continuing and progressive' water intrusion" that commenced after January 31, 1996, and was not the subject of repair work until February 14, 2008. Travelers cites *Peck* v. *Public Service Mutual Ins. Co.*, 363 F. Supp. 2d 137 (D. Conn. 2005), in support of its argument that courts have "rejected under Connecticut law the same 'occurrence during the policy period' argument that Netherlands advances [in this] appeal," and contends that "Netherlands policies . . . do not require that the 'occurrence' happen during the periods they cover; they require only that resulting 'property damage' occurs during those periods." We agree with Travelers, and conclude that the underlying complaint alleges property damage within Netherlands' policy periods.

The underlying complaint alleges in relevant part that "Lombardo, under a prime contract with the state . . . performed masonry and related services at the [law library] [p]roject." It then alleges that the law library "[p]roject was designed starting in 1992 and construction commenced in 1994, with completion in 1996," and the "state began occupying the [law] library on January 31, 1996." Further, "[d]uring the months and years following completion of the project and occupancy by the state, the state began to experience problems with water intrusion into the [law] library. The defendants [in the underlying action] were given notice of these problems and frequently visited the [law] library to ascertain the nature and extent of the problem. During the project, the defendants [in the underlying action] had provided written assurances that their work and/ or materials were free from defects, and the state relied

on those assurances. At no point did the defendants [in the underlying action] disclose that those assurances were false." The complaint then states that "[o]ver the years the water intrusion proved to be continuing and progressive, to the point that in the 2000s the state retained forensic engineers to investigate the full extent and likely causes of the problem." The underlying complaint claimed that a forensic investigation revealed numerous defects, including "[i]mproper flashing material, design, and installation," "[i]mproper design and installation of the windows," and "[i]mproper design and installation of the wall anchoring system, such that the exterior stone facade of the [law] library is not adequately stabilized and secured," all of which "have caused tangible and physical harm to the [law] library . . . ." The state "retained an engineering firm to design corrective work, and awarded the contract to perform that work," which was underway when the state filed the underlying action in 2008. The state alleged that "[b]efore completing the design of the corrective work the state provided copies of design documents and forensic findings to the defendants [in the underlying action] and sought their comments and input." From these facts, the state pleaded claims of breach of contract, negligence, negligent misrepresentation, and intentional misrepresentation against Lombardo.

We conclude that the underlying complaint alleges property damage that triggered Netherlands' duty to defend Lombardo. Netherlands' policies covered periods from August 31, 2000 until June 30, 2006. Although the construction of the law library was completed in 1996, the problems began in the "months and years" that followed the state's occupancy on January 31, 1996, and the "water intrusion proved to be continuing and progressive" into the 2000s, when the "state retained forensic engineers to investigate the full extent and likely causes of the problem." Thus, the property damage alleged in the underlying complaint—however broadly worded—extended into Netherlands' policy periods.

Netherlands argues, however, that "[a]ll of the water intrusions constitute one occurrence, which began soon after January, 1996," and "all of the property damage alleged by the state was caused by Lombardo's alleged defective construction. The fact that the property damage progressed and took different forms over time does not trigger subsequent policies." Netherlands' argument, however, contradicts the plain and unambiguous language of the policy, which "does not require that the 'occurrence' take place within the policy period, only that the resulting injury or property damage occur during the policy period." *Peck* v. *Public Service Mutual Ins. Co.*, supra, 363 F. Supp. 2d 142; see also id., 142–44 (no coverage under commercial general liability policy for property damage claim limited to loss of use because occurrence, namely, continuous exposure to loud music

and vibrations, took place outside policy period, and policy provided that " '[a]ll such loss of use shall be deemed to occur at the time of the "occurrence" that caused [loss of use]' " [emphasis omitted]). Indeed, as we recently decided in interpreting identical CGL policy language in *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 760, the " 'occurrence' " is the defective work, whereas the "property damage"—in this case water intrusion—results from that occurrence. See id., 776 ("[W]e conclude that defective workmanship can give rise to an 'occurrence' under the insuring agreement. This is, however, only the first step in determining whether the damage at issue . . . is covered under the policy. The terms of the insuring agreement require both an 'occurrence' and 'property damage' for coverage. We therefore turn to consider the 'property damage' requirement of the insuring agreement."). Accordingly, we conclude that the underlying complaint alleges property damage within the periods of Netherlands' policies.[27]

## B

### "Known Injury or Damage" Clause

We next address Netherlands' claim that the "known injury or damage" exclusion of the CGL policy precludes coverage because, "if Lombardo knew the damage to the [law] library had begun in whole or in part prior to Netherlands' policy period, Netherlands will not cover any of the property damage. Since the state alleges it gave Lombardo notice of the water intrusion and damage within months of January 31, 1996, it is clear that Lombardo knew about the property damage to the [law] library, at least in part, before Netherlands' coverage began on August 31, 2000." (Emphasis omitted.) Relying on, inter alia, *Travelers Casualty & Surety Co.* v. *Dormitory Authority*, 732 F. Supp. 2d 347 (S.D.N.Y. 2010), and *Quanta Indemnity Co.* v. *Davis Homes, LLC*, supra, 606 F. Supp. 2d 941, Netherlands argues that the trial court improperly relied on the common-law known loss doctrine, which is distinct from the express policy language. In response, Travelers does not appear to challenge Netherlands' understanding of the known injury or damage exclusion of the CGL policy vis-a-vis the known loss doctrine, but argues that Netherlands improperly reads facts into the underlying complaint in support of its contention that the known injury or damage exclusion bars coverage. We agree with Travelers, and conclude that, based on the allegations in the underlying complaint, the known injury or damage exclusion does not relieve Netherlands of its duty to defend.

By way of background, we note that the known loss doctrine is a common-law rule that derives from the "implicit requirement read into every liability insurance policy that coverage will be provided only for fortuitous losses . . . ." 1 B. Ostrager & T. Newman, Handbook

on Insurance Coverage Disputes (16th Ed. 2013) § 8.02[a], p. 676; see id., § 8.02, p. 673 ("by definition, insurance is not available for losses that the policy-holder knows of, planned, intended, or is aware are substantially certain to occur"). "[T]he known loss doctrine embraces the fortuity requirement by precluding coverage for a loss known to be certain to create a liability at the time the policy is issued." Id., § 8.02[c], p. 685. "[I]n its most simplistic formulation, [the known loss doctrine] states that one may not insure against loss of a building after the building has burned down." *Steadfast Ins. Co.* v. *Purdue Frederick Co.*, Superior Court, judicial district of Stamford-Norwalk, Complex Litigation Docket, Docket No. X08-CV-02-0191697-S (April 11, 2006) (41 Conn. L. Rptr. 183, 184). No appellate level court in Connecticut has yet applied the common-law known loss doctrine, nor determined the extent to which losses are deemed to be "known" prior to the issuance of coverage.[28] See, e.g., *Known Litigation Holdings, LLC* v. *Navigators Ins. Co.,* 934 F. Supp. 2d 409, 419–20 (D. Conn. 2013).

This appeal does not, however, require us to consider the contours of the common-law known loss doctrine in Connecticut because, as Netherlands points out, the "known injury or damage" exclusion in the CGL policy stands in distinction to that common-law principle; the contractual provision, when it exists, governs independently of the common-law rule, although they may have overlapping effects in certain cases. See, e.g., *Travelers Casualty & Surety Co.* v. *Dormitory Authority*, supra, 732 F. Supp. 2d 362. Thus, a state's narrow formulation of the known loss rule; see footnotes 29 and 30 of this opinion; "cannot be used to defeat the unambiguous contrary intent of the parties as reflected in the policy language itself."[29] *Travelers Casualty & Surety Co.* v. *Dormitory Authority*, supra, 362; see id., 361–62 (rejecting argument that known injury exclusion "should be construed in accordance with the known-risk or known-loss doctrine under New Jersey law," which "does not bar liability for mere knowledge of events that might hypothetically or potentially create liability in the future, but instead, bars coverage only when the legal liability of the insured is a certainty" [emphasis omitted; internal quotation marks omitted]).

Although the trial court's analysis improperly conflated the common-law known loss doctrine with the Netherlands policies' known injury or damage exclusion; see footnote 10 of this opinion; we nevertheless conclude that it properly determined that the exclusion does not relieve Netherlands of its duty to defend in this case. Although the allegations in the underlying complaint arguably permit a reasonable inference that Lombardo knew of the property damage in the law library prior to the inception of its policies with Netherlands, unlike in other cases with more detailed factual records,[30] they do not compel that conclusion as a mat-

ter of law, especially given the well established maxim that, "[i]f an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." (Internal quotation marks omitted.) *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, 264 Conn. 688, 712, 826 A.2d 107 (2003). Although paragraph 43 of the underlying complaint avers that the "defendants were given notice of these [water intrusion] problems and frequently visited the [law] library to ascertain the nature and extent of the problem," those allegations do not specify exactly *when* Lombardo received notice, other than to state that the water problems began "[d]uring the months and years" following the project's completion and the state's occupancy in January, 1996, and that forensic engineers were retained in the "2000s." Similarly, the underlying complaint does not state when exactly those engineers' reports were provided to Lombardo, only that they were at some point.[31] Insofar as Netherlands was not Lombardo's only insurer during the eight years of the 2000s leading up to the state's filing of the underlying action, and because we construe insurance policies to afford coverage whenever possible, we conclude that the trial court properly determined that the facts alleged in the underlying complaint do not preclude coverage for purposes of the duty to defend.

## III

### ALLOCATION PERIOD

We next turn to Netherlands' claim that the trial court improperly allocated the defense costs over a period of 144 months. Specifically, Netherlands argues that this allocation period for determining the insurers' pro rata share "is contradicted by the controlling precedent," namely, the decision of this court in *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 264 Conn. 688, in which, Netherlands contends, we adopted the "exposure theory of triggering coverage." Netherlands asserts that, under that theory, wherein "the exposure period runs from first injury to manifestation," the allocation period should have been no more than twelve months because the injury was the water intrusion, which manifested less than one year after the state's occupancy of the law library on January 31, 1996. In response, Travelers argues that Netherlands misreads *Security Ins. Co. of Hartford*, and argues that we actually adopted in that decision "an 'injury-in-fact trigger,' under which progressive injuries that span multiple policy periods trigger all policies in effect during the progression of the injury," which in this case was a period of 144 months. We agree with Travelers, and conclude that, consistent with the "continuous trigger" situation addressed in *Security Ins. Co. of Hartford*, the trial court properly allocated the insurers' pro rata shares over a 144 month period.

In *Security Ins. Co. of Hartford*, we concluded that

"the pro rata method of allocating defense costs applies in long latency loss claims that implicate multiple insurance policies"; *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 264 Conn. 700; in that case, litigation arising from "bodily injuries allegedly resulting from the inhalation of asbestos" during a period of time from 1951 through 1996. Id., 691–92. In applying the pro rata method in *Security Ins. Co. of Hartford*, we upheld the trial court's determination that the "asbestos litigation involved a 'continuous trigger situation such that all asbestos related injury policies issued during the extended exposure period have been triggered for coverage and all companies that issued such policies are responsible for defense costs related to the . . . asbestos litigation.' " Id., 696–97. In describing this ruling of the trial court, we set forth in a footnote four theories of the trigger of coverage, namely, "[m]anifestation," "[e]xposure," "[i]njury-in-fact or actual injury," and "[m]ultiple, [c]ontinuous, or [s]uccessive trigger."[32] (Emphasis omitted; internal quotation marks omitted.) Id., 697 n.12.

Contrary to Netherlands' argument, nowhere in *Security Ins. Co. of Hartford* did we adopt the exposure trigger of coverage.[33] Rather, we upheld a pro rata allocation based on the trial court's unchallenged decision that the continuous trigger theory applied, thereby bringing into play all of the insured's liability policies over the forty plus year claim period in that case, expressly holding, without further elaboration, that the trial court's allocation therein was "reasonable . . . ." Id., 720 n.17; see also id., 697 n.12 (defining continuous trigger theory). Indeed, there is no subsequent Connecticut authority holding to the contrary. See *Steadfast Ins. Co.* v. *Purdue Frederick Co.*, Superior Court, judicial district of Stamford-Norwalk, Complex Litigation Docket, Docket No. X08-CV-02-0191697-S (May 18, 2006) (41 Conn. L. Rptr. 604, 608) (noting that trial court in *Security Ins. Co. of Hartford* applied continuous trigger approach and stating that "[a]lthough the reason multiple insurance policies are triggered in this case differs from the reason in *Security* [*Ins. Co. of Hartford*], under the reasoning of *Security* [*Ins. Co. of Hartford*], the defense cost should be allocated among the triggered policies and [the insurer] should only be liable for a pro-rata share of the defense costs of the suits in which the complaint does not allege a specific date of injury"); accord *United Technologies Corp.* v. *American Home Assurance Co.*, 989 F. Supp. 128, 153 (D. Conn. 1997) ("[T]he [c]ourt believes that Connecticut would apply the multiple injury trigger in gradual environmental contamination cases. Interpreting the injury-in-fact approach as having multiple triggers reflects the reality that one contaminating event can result in several different losses after the date of its occurrence."). Accordingly, we see no basis for Netherlands' argument that *Security Ins. Co. of Hartford* holds that Connecti-

cut applies the exposure trigger theory in cases wherein there is an extended injury implicating multiple policies. We, therefore, conclude that the trial court properly determined that the appropriate allocation period was 144 months.

## IV

## UNCLEAN HANDS CLAIMS

Finally, we turn to Netherlands' claims that the trial court: (1) improperly denied its motion for permission to amend its answer and special defenses to assert the special defense of unclean hands; and (2) improperly precluded it from presenting evidence of Travelers' unclean hands at trial.

Before addressing these claims in detail, we note that the record reveals the following additional relevant facts and procedural history. On January 24, 2012, less than two weeks before the trial date of February 2, 2012, Netherlands filed a request for permission to amend its answer and special defenses to assert a sixth special defense, namely, unclean hands. Netherlands represented that the addition of this special defense was prompted by Travelers' disclosure, on December 21, 2011, of supplemental discovery in response to a request by Lumbermens; see footnotes 1 and 4 of this opinion; that had alerted Netherlands to previously unknown facts. In that proposed special defense, Netherlands averred that this new discovery proves that Travelers knew that Netherlands did not have a duty to defend in the underlying case, rendering this declaratory judgment action "[wilful] misconduct" by Travelers, thus barring its request for equitable relief under the doctrine of unclean hands.[34] In response, Travelers objected to the motion, contending that Netherlands' request, made barely one week before trial, was prejudicially late and was conclusory because it did not state which documents, of the nearly 6000 pages of discovery that had been produced, constituted the newly discovered evidence that supported Netherlands' late amendment. Travelers also argued, consistent with its evidentiary objections at trial,[35] that the only evidence relevant to the dispute before the court, concerning the duty to defend, was the underlying complaint and Netherlands' insurance policy.

During a hearing on the motion, the court and the parties discussed whether the court needed to rule on the motion, given Travelers' withdrawal of the second count of the complaint seeking equitable subrogation, discussed in part I of this opinion. Ultimately, counsel for Netherlands stated that the special defense would apply to both counts, given that the declaratory judgment count in the complaint alleged injury to Travelers' legal and equitable rights, and sought remedies under both theories. Counsel for Netherlands then informed the court that it had received more than 7000 pages

of documents in December indicating "that there was information within the Travelers' own file that supported our position that Lombardo knew and when they knew of this loss. And that becomes relevant because they've come in to here and asked us to contribute to a defense that they had absolute knowledge . . . that our policy did not cover . . . for the claims being made." In response, counsel for Travelers argued that none of the evidence was relevant under the four corners rule for determining the duty to defend.[36] Ultimately, the trial court denied Netherlands' motion for permission to amend the answer and special defenses to assert the special defense of unclean hands, noting the age of the case, and that Netherlands' motion was not acknowledged on the operative pleadings contained in the parties' joint trial management report, filed on January 26, 2012. Indeed, counsel for Netherlands acknowledged that this omission was an "oversight."

Further, in connection with Travelers' motion to exclude extrinsic evidence; see footnote 35 of this opinion; and consistent objections, the trial court subsequently concluded that, under Connecticut law, evidence beyond the underlying complaint and the policy at issue is irrelevant. Accordingly, the trial court declined to consider any evidence with respect to Lombardo's knowledge, including sustaining on relevance grounds Travelers' objections to Netherlands' attempts to elicit testimony about reservation of rights letters from Travelers to Lombardo in 2003, 2005 and 2006.

## A

### Motion to Amend

Netherlands contends that the trial court abused its discretion in denying its motion for permission to amend its answer and special defenses to assert the special defense of unclean hands. Netherlands claims that the trial court improperly denied the motion to amend because it had not received and reviewed the motion papers before rendering a decision, meaning that it could not have understood the factual and legal basis for the motion. Netherlands also contends that granting this motion would not have prejudiced or surprised Travelers, as presentation of evidence of unclean hands would not have required additional witnesses beyond those who testified at the court trial, and the supporting documentary evidence had already been disclosed by Travelers. In response, Travelers contends that the trial court did not abuse its discretion in denying Netherlands' motion because any evidence of unclean hands was legally irrelevant to the issues before the court following Travelers' withdrawal of the second count of the complaint. Travelers also posits that the proposed amendment was untimely and would have worked an injustice, because it was filed less than two weeks before trial in this case, which had been pending for more than two years. We agree with Travelers and,

accordingly, conclude that the trial court did not abuse its discretion by denying Netherlands' motion for permission to amend the special defenses.

"Our standard of review . . . is well settled. While our courts have been liberal in permitting amendments . . . this liberality has limitations. Amendments should be made seasonably. Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The motion to amend is addressed to the trial court's discretion which may be exercised to restrain the amendment of pleadings so far as necessary to prevent unreasonable delay of the trial. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . It is [Netherlands'] burden in this case to demonstrate that the trial court clearly abused its discretion." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, supra, 266 Conn. 583–84; see also *Ruggiero* v. *Pellicci*, 294 Conn. 473, 480–81, 987 A.2d 339 (2010) (per curiam); *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 255, 905 A.2d 1165 (2006). That an amendment would confuse the issues in the case also supports a trial court's decision to deny permission to amend a complaint or special defense. See *Rose* v. *Messier*, 1 Conn. App. 563, 565, 474 A.2d 100 (1984).

We conclude that the trial court did not abuse its discretion in denying the motion for permission to amend its pleadings to assert the defense of unclean hands. First, Netherlands' argument that the trial court could not have understood the motion because it ruled on it without first reviewing the papers is unconvincing. Although Netherlands accurately observes that, because of a clerical oversight, the motion initially was not included in the court's paper file at the time of trial in this preelectronic filing case, that lapse did not mean that the trial court did not review or understand the motion. The record reveals that the parties provided the trial court with a courtesy copy of the two page motion, and the trial court reviewed the parties' motions during recesses insofar as they pertained to the evidentiary issue raised by Travelers, in addition to hearing extensive oral argument with respect to the legal propriety of Netherlands going beyond the pleadings and policy in attacking its duty to defend.

Second, the trial court's denial of the motion was consistent with its subsequent evidentiary rulings at trial with respect to the admission of extrinsic evidence concerning what Lombardo may have known with respect to the underlying claim. Insofar as Netherlands' has failed to challenge those rulings properly in this appeal; see part IV B of this opinion; any relief that we

could grant by concluding the trial court had abused its discretion in denying the corresponding motion for permission to amend would be illusory. Accordingly, we decline to disturb the trial court's exercise of its discretion to deny Netherlands' motion to amend. See *Wallingford* v. *Glen Valley Associates, Inc.*, 190 Conn. 158, 162, 459 A.2d 525 (1983) (trial court properly denied permission to amend defenses that would have "assert[ed] what the court had disallowed in the counterclaim").

## B

### Evidence concerning Unclean Hands

Netherlands also contends that the trial court improperly prohibited it from presenting evidence of Travelers' unclean hands, namely, "Travelers' knowledge of the notice of damage provided to the insured before Netherlands' policy period." Netherlands contends that this court should extend the rule of *Hartford Casualty Ins. Co.*, which allows an insurer to " 'be obligated to provide a defense not only based on the face of the complaint but also if any facts known to the insurer suggest that the claim falls within the scope of coverage' "; *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, supra, 274 Conn. 466–67; and hold that, "when one insurer is in possession of knowledge that shows a claim does not fall within another insurer's coverage, the carrier should not be permitted to make a claim for contribution based on a 'face of the complaint' argument." Netherlands posits that such an extension is consistent with our holding in *Hartford Casualty Ins. Co.* that "the duty to defend derives from the insurer's contract with the insured, not from the complaint"; (internal quotation marks omitted) *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, supra, 467; and argues that "Travelers should not be permitted to use a third party's complaint to create duties that do not exist under the contract between Netherlands and Lombardo." In response, Travelers posits that Netherlands' argument suggests an "illogical and unprecedented" change in the law that "suffers [from] the obvious and fatal flaw of rewarding insurers who default on their defense obligation and penalizing those who meet their obligations." Travelers also argues that we should decline to review Netherlands' claim because it is unpreserved. We decline to review this claim because it is unpreserved.

"It is well settled that [o]ur case law and rules of practice generally limit [an appellate] court's review to issues that are distinctly raised at trial. . . . [O]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial— after it is too late for the trial court or the opposing

party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Citations omitted; internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142, 84 A.3d 840 (2014).

Netherlands does not, in its main brief or reply brief, identify where it asked the trial court to adopt the rule that it advocates on appeal, specific to the context of suits by insurers against other insurers. Further, our independent review of the record does not indicate that this issue was raised before the trial court.[37] Accordingly, it is unpreserved and we decline to review it in this appeal.[38]

The judgment is affirmed.

In this opinion the other justices concurred.

[1] Also named as defendants in this case were the Peerless Insurance Company (Peerless) and the Lumbermens Mutual Casualty Company (Lumbermens). All claims and cross claims against Lumbermens have been withdrawn. It has not filed an appearance in this appeal. Further, because Peerless was an umbrella carrier not obligated to defend Lombardo if Netherlands had that obligation, no judgment entered as to Peerless, and its policies are not at issue in this appeal.

[2] Netherlands appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] For a more detailed explanation of the underlying action, see *State* v. *Lombardo Bros. Mason Contractors, Inc.*, supra, 307 Conn. 420–22.

[4] The trial court noted that "[t]he parties stipulated that Lumbermens . . . settled with [Travelers] before trial commenced." Accordingly, Lumbermens is no longer a party to this appeal. See footnote 1 of this opinion.

[5] We note that Travelers' complaint seeks relief from Peerless, rather than Netherlands. Because of the umbrella nature of Peerless' coverage for the policy periods at issue, consistent with the parties' briefs and the trial court's decision, we refer to Netherlands instead. Specifically, we need not consider the Peerless umbrella policies because those policies sit atop the Netherlands primary CGL policies; should we conclude that there is a duty to defend under the primary CGL policies, there is correspondingly no defense obligation under the umbrella policies. See also footnote 1 of this opinion.

[6] For the applicable CGL policy language, see the detailed facts set forth in part II of this opinion.

[7] The trial court, *Hon. Jerry Wagner*, judge trial referee, had previously denied the parties' cross motions for summary judgment.

[8] The trial court observed that: "Netherlands' coverage began on August 31, 2000, and the state's [underlying] complaint states that some time in 'the 2000s' it retained a forensic engineer to investigate the full extent and likely causes of the problem. Therefore, Netherlands would be responsible for the continued water intrusion that occurred from August 31, 2000, onward."

[9] Relying on this court's explanations of occurrence clauses in CGL policies as they apply to long spanning latent defects in *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, 264 Conn. 688, 826 A.2d 107 (2003), and *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 765 A.2d 891 (2001), the trial court concluded that "the occurrence triggering Netherlands' policy and duty to defend was the water intrusion that caused property damage to the law library." The trial court rejected Netherlands' argument that the "occurrence was the negligent construction that started in 1994 and ended in 1996, before their policy period began in 2000," concluding that the plain and unambiguous language of its policy demonstrated that "the water leaking through the masonry and causing physical injury to the property within constitutes an occurrence."

[10] Given that this case "include[d] multiple parties with potential liability, and a loss which occurred over the course of many years," the trial court rejected Netherlands' reliance on the common-law known loss doctrine and the known injury or damage exclusion contained in its CGL policies; see part II of this opinion; in support of its argument that it "has no duty to

defend Lombardo because Lombardo was on notice of the damage to the [law] library, in whole or in part, before Netherlands' coverage began," based on the notifications from the state to Lombardo and other contractors about the leaks in the law library. The trial court viewed the policy exclusion "to be analogous to the 'known loss' doctrine," which, under *Nationwide Property & Casualty Ins. Co.* v. *Greater New York Mutual Ins. Co.*, Superior Court, judicial district of New Britain, Docket No. CV-06-5002440-S (August 10, 2009) (48 Conn. L. Rptr. 397, 400), and *Peck* v. *Public Service Mutual Ins. Co.*, 363 F. Supp. 2d 137, 145 (D. Conn. 2005), applies only to actual losses, rather than potential losses.

[11] General Statutes § 52-29 provides: "(a) The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment.

"(b) The judges of the Superior Court may make such orders and rules as they may deem necessary or advisable to carry into effect the provisions of this section."

[12] See *Travelers Property Casualty Co. of America* v. *Continental Casualty Co.*, Superior Court, judicial district of New London, Docket No. CV-08-4008325-S (December 29, 2008) (47 Conn. L. Rptr. 18); *Vermont Mutual Ins. Co.* v. *Westwood Condominium Assn.*, Superior Court, judicial district of Hartford, Docket No. CV-03-0825593-S (March 30, 2005); *Steadfast Ins. Co.* v. *Purdue Frederick Co.*, Superior Court, judicial district of Stamford-Norwalk, Complex Litigation Docket, Docket No. X08-CV-02-0191697-S (June 17, 2003) (35 Conn. L. Rptr. 87).

[13] Practice Book § 17-55 provides: "A declaratory judgment action may be maintained if all of the following conditions have been met:

"(1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations;

"(2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and

"(3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

[14] Specifically, counsel for Travelers explained: "We will withdraw [the equitable subrogation] count for this reason: In order to demonstrate the amount of money we've spent and the percentage . . . we're entitled to [get] back, we would have to put the defense bills in evidence. As yet, Netherlands has not acknowledged the defense obligation. If we provide those bills to Netherlands we cannot do it within a privilege; we do not have a common interest privilege with Netherlands at this point. Those bills would therefore not necessarily at least be protected from discovery by the state because we could not provide them within a protection or privilege. And in order to address that problem and to protect the rights of Lombardo— this case perhaps coming back to life against Lombardo, no one knows— we have agreed with Netherlands that rather than seeking a money judgment if we prevail we will simply ask the court to declare the percentage of defense costs that Netherlands owes, and if that happens then we will have a privilege with Netherlands, we will both be defending insurers, we can provide unredacted copies of the bills to it. And we will, between us, sort out what 48.6 percent of the bills is. So Travelers is not now seeking a money judgment; it's simply seeking a declaration and the reason is just to avoid the potential problem of having defense bills be in the world in a case that's not necessarily resolved."

[15] Specifically, counsel for Netherlands explained that her "understanding of that agreement . . . is that . . . we would not be putting in the bills because—and I totally agree with this . . . there are entries in each billing entry that may describe something that was done that's work product, attorney/client privilege information that it would not be appropriate to make those documents public and certainly in light of the atmosphere that we have now with . . . complete transparency and everybody being able to look at everything in court files and once it became public. So we agreed that . . . were this court to find that they were entitled to the reimbursement that we would deal with that once they were entitled to their reimbursement."

[16] Specifically, the transcript reveals the following colloquy:

"The Court: So what I'm hearing you say or what I'm jumping ahead that

you're going to tell me is that you think that a victory by Travelers on the first count saying there's a declaratory judgment that there's a duty to defend and that—that I can't go on on the first count and declare a percent and I would have to do that under the equitable subrogation count? And your associate is nodding urgently hoping you'll see her.

"[Netherlands' Counsel]: I think that's right, Your Honor. I really hadn't thought it through; she probably thought it through more than I have but I think that's true.

"The Court: Well, that's interesting."

[17] We note that these competing federal and sister state authorities have been revealed by our independent research. The authorities contained in the parties' briefs are limited to Connecticut Superior Court decisions.

[18] The dispute between the insurers must, of course, be ripe with respect to the triggering of their defense or indemnity coverage. See, e.g., *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 814–15, 967 A.2d 1 (2009).

[19] We note the presence of several federal cases consistent with the reasoning of the Eleventh Circuit in *Provident Life & Accident Ins. Co*. See, e.g., *Travelers Indemnity Co.* v. *Standard Accident Ins. Co*., 329 F.2d 329, 331–32 (7th Cir. 1964); *Liberty Mutual Ins. Co.* v. *Jotun Paints, Inc.*, United States District Court, Docket No. Civ. A. 07-3114 (LMA) (E.D. La. March 25, 2008); *TIG Ins. Co.* v. *Merryland Childcare & Development Center, Inc*., United States District Court, Docket No. 04-2666 B (DJB) (W.D. Tenn. November 9, 2005); *Trinity Universal Ins. Co.* v. *Turner Funeral Home, Inc*., United States District Court, Docket No. 1:02CV231 (RAE) (E.D. Tenn. December 12, 2003).

[20] Sister state cases revealed by our research are consistent with *United Services Automobile Assn.* v. *Royal-Globe Ins. Co*., supra, 511 F.2d 1094. See, e.g., *Louisville Fire & Marine Ins. Co.* v. *St. Paul Fire & Marine Ins. Co*., 252 Ala. 532, 535, 41 So. 2d 585 (1949) (declaratory judgment action "well filed" because "the policies of the two insurance companies were in force at the date of the destruction of [the insured's] property, the status of the complainant and defendant was that of insurers of the same property of the same insured against the same hazard and they are each proportionately and severally liable for the loss at the ratio which the amount of their respective policies bears to the whole insurance covering the property against the perils involved"); *Miller* v. *Windsor Ins. Co*., 923 S.W.2d 91, 94 (Tex. App. 1996) (reinsurer is "interested party" with standing under state declaratory judgment act, despite not being party to policy at issue); *Mountain West Farm Bureau Mutual Ins. Co.* v. *Hallmark Ins. Co*., 561 P.2d 706, 710–11 (Wyo. 1977) (concluding that insurer may bring declaratory judgment against another insurer whose policy covered same vehicle, despite "well settled" rule " 'that in no case can a stranger to a contract maintain an action upon it, or for the breach of it,' " but concluding that no justiciable issue exists when plaintiff did not admit its own policy into evidence in order to demonstrate interest in other insurer's policy).

We acknowledge that some sister state decisions hold to the contrary and support Netherlands' position in this appeal. See *State Farm Mutual Automobile Ins. Co.* v. *Astro Leasing, Inc.*, 194 Ga. App. 515, 517, 390 S.E.2d 885 (1990) (insurer, which had admitted obligation as excess insurer and defended insured, lacked standing to bring declaratory judgment action against primary insurer that had refused to defend), cert. denied, Docket No. S90C0711, 1990 Ga. LEXIS 785 (Ga. April 5, 1990); *St. Paul Fire & Marine Ins. Co.* v. *Medical Protective Co. of Fort Wayne, Ind.*, 675 S.W.2d 665, 667 (Mo. App. 1984) (liability insurer lacked standing to bring declaratory judgment action seeking declaration that its coverage was excess to that of defendant because it was not party to defendant's policy, insured had not been named, and there was no evidence that insured had asked defendant to provide coverage); *State* v. *Medical Malpractice Joint Underwriting Assn.*, Docket No. 03-0743, 2005 WL 1377493, *2 (R.I. Sup. June 7, 2005) (state lacked standing to bring declaratory judgment action against private insurer of state employee physician to determine whether carrier was obligated to defend state in pending action, because it was not party, named insured or third party beneficiary of that policy). We view these decisions as contrary to the liberal interpretation that we accord to our declaratory judgment statute, and the body of federal case law that is consistent with that approach.

[21] These cases also are consistent with the Superior Court decisions relied upon by Travelers. See footnote 12 of this opinion. Further, we note our disagreement with Netherlands' reliance on *Century Indemnity Co.* v. *North-*

*east Utilities*, supra, Superior Court, Docket No. CV-98-0495496-S, and do not view that case as indicative of a Superior Court split on this issue. *Century Indemnity Co.* is in essence a ripeness decision, rather than one where the insurer was deemed to lack standing on account of lack of a contractual relationship with the other insurers in the case. Although the court, *Aurigemma, J.*, stated that an insurer "lacks standing to sue to enforce any obligations created by the insurance contracts between [the insured] and the other insurers"; id.; it then acknowledged the insurer's argument that it was in fact seeking a declaratory judgment and engaged in a detailed ripeness analysis, holding that the insurer's liability to its insured had not yet been determined, meaning that it did not at that point have a "legal interest in insurance coverage provided to [the insured] by the other insurer defendants. While there may be some future dispute between [the plaintiff insurer] and the other insurers, none exists now. Therefore, [c]ount [two] fails to satisfy the statutory prerequisites for a declaratory judgment action because [the plaintiff insurer] has no current interest and no dispute exists with respect to the defendant insurers. Practice Book § 17-55." Id.

[22] Of course, if the insured's substantive rights and interests may be affected by the outcome of the declaratory judgment proceeding, due process concerns require it to be joined as an indispensable party. See, e.g., *Batte-Holmgren* v. *Commissioner of Public Health*, supra, 281 Conn. 289–90.

[23] We note that the first count of Travelers' complaint does not use the term "breach of contract," or complain of any damages to Lombardo caused by Netherlands' failure to defend Lombardo with respect to the underlying claim. Rather, the complaint focuses on the detriment suffered by Travelers insofar as it "is bearing more than its fair share of Lombardo's defense."

[24] As Netherlands accurately points out, although the second count of the complaint is titled "equitable subrogation," the allegations therein more accurately reflect a cause of action for "equitable contribution" between insurers, particularly as Travelers' claim does not appear to place it "in the shoes" of Lombardo, its insured. See *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, 264 Conn. 688, 714, 826 A.2d 107 (2003) ("Contribution is a payment made by each, or by any, of several having a common interest or liability of his share in the loss suffered, or in the money necessarily paid by one of the parties in behalf of the others. . . . The right of action for contribution, which is equitable in origin, arises when, as between multiple parties jointly bound to pay a sum of money, one party is compelled to pay the entire sum. That party may then assert a right of contribution against the others for their proportionate share of the common obligation. . . . Where more than one insurer has issued policies covering the same risk, a court of equity will exercise jurisdiction over the entire controversy to resolve the rights of all the interested parties, particularly where the issues between the insurers and the insured are similar." [Citation omitted; emphasis omitted; internal quotation marks omitted.]); see also 1 B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes (16th Ed. 2013) § 6.01[b], pp. 466–67 (explaining relationship and differences between doctrines of contribution and subrogation).

[25] "An insurer asserting that a claim is not covered under its policy can either refuse to defend or it [can] defend under a reservation of its right to contest coverage under the various avenues which would subsequently be open to it for that purpose. . . . If the insurer declines to provide its insured with a defense and is subsequently found to have breached its duty to do so, it bears the consequences of its decision, including the payment of any reasonable settlement agreed to by the plaintiff and the insured, and the costs incurred effectuating the settlement up to the limits of the policy." (Citation omitted; internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 806, 67 A.3d 961 (2013).

[26] This language is contained in each of the CGL policies that Netherlands had issued for policy terms August 31, 2000 through June 30, 2001, and renewed annually thereafter for five years from June 30, 2001 through June 30, 2006. It was an endorsement to the first three policies, and incorporated in the standard text of the remaining three.

[27] We disagree with Netherlands' reliance on *Quanta Indemnity Co.* v. *Davis Homes, LLC*, supra, 606 F. Supp. 2d 941, in support of the proposition that the "fact that the property damage progressed and took different forms over time does not trigger subsequent policies." In holding that there was no coverage under the commercial general liability policy at issue in *Quanta Indemnity Co.*, the court did not rely on the progressive nature of the bodily injury, but rather, on the policy's "known loss" exclusion. See *Quanta Indemnity Co.* v. *Davis Homes, LLC*, supra, 947–49; see also discussion in

part II B of this opinion.

[28] "[C]ourts have utilized varying standards in evaluating whether losses were 'known' at the time coverage was purchased." 1 B. Ostrager & T. Newman, supra, § 8.02[c], p. 685. Several Superior Court and local federal district court decisions explain the differences between the various approaches to the common-law known loss rule. "In its broadest formulation, the rule would preclude coverage whenever an injury began prior to the inception of the insurance policy." *Peck* v. *Public Service Mutual Ins. Co.*, supra, 363 F. Supp. 2d 144–45. These courts have, however, concluded that we would adopt a narrow version of the known loss doctrine that would limit it "to circumstances where the insured was aware of *actual losses*, not potential losses prior to purchasing the policy." (Emphasis added; internal quotation marks omitted.) *Known Litigation Holdings, LLC* v. *Navigators Ins. Co.*, supra, 934 F. Supp. 2d 419, citing *Peck* v. *Public Service Mutual Ins. Co.*, supra, 145; *Nationwide Property & Casualty Ins. Co.* v. *Greater New York Mutual Ins. Co.*, Superior Court, judicial district of New Britain, Docket No. CV-06-5002440-S (August 10, 2009) (48 Conn. L. Rptr. 397, 400).

[29] The known injury or damage exclusion is known in the insurance industry as the Montrose endorsement because Insurance Services Office, Inc., the association that has developed the standard form commercial general liability insurance policy used throughout the United States; see, *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 773–74; promulgated it in response to the California Supreme Court's narrow application of the common-law known loss and loss in progress doctrines in *Montrose Chemical Corp. of California* v. *Admiral Ins. Co.*, 10 Cal. 4th 645, 693, 913 P.2d 878, 42 Cal. Rptr. 2d 324 (1995), which held, inter alia, that in the context of commercial general liability insurance, a legally insurable risk exists so long as "no legal obligation to pay third party claims has been established . . . ." See, e.g., E. Powell et al., "The ISO CG 00 57 09 99 'Montrose' Endorsement," Independent Insurance Agents of America, Inc. (July 2000) p. 7 ("[i]f the courts want to remove the 'known loss' rule from the lexicon of insurance contract law, then the insurance industry will have to explicitly incorporate this principle into their liability contracts, which is what [Insurance Services Office, Inc.] has attempted to do"), available at http://www.cib-online.com/PDFfiles/montrose.pdf (last visited July 15, 2014); C. Stanovich, "Known Injury or Damage," IRMI Risk & Insurance (October 2003) ("In their January, 1999 Circular, Insurance Services Office, Inc. . . . announced that the Montrose case, along with other court decisions, rendered the known loss rule inapplicable to [commercial general liability]," and "the likelihood of an insured's liability for such continuing known injury or damage was not to be considered. [Commercial general liability] coverage was not to apply [even for defense], despite the fact that the insured may have no liability and therefore no CGL loss. Thus, the known loss or loss-in-progress rule was transformed to a known injury or damage rule."), available at http://www.irmi.com/expert/articles/2003/stanovich10.aspx (last visited July 15, 2014).

[30] Some of these cases appear to consider extrinsic evidence, along with the allegations in the underlying complaint, to determine whether the insured knew of the property damage at issue for purposes of determining whether the known injury or damage provision barred coverage. See *Tower Ins. Co.* v. *Dockside Associates Pier 30 LP*, 834 F. Supp. 2d 257, 266–67 (E.D. Pa. 2011) (considering complaint letters to and from insured's management about water infiltration into condominiums, produced by insurer, in concluding that they are "not . . . entitled to coverage"); *Travelers Casualty & Surety Co.* v. *Dormitory Authority*, supra, 732 F. Supp. 2d 361 (considering letters and other undisputed extrinsic evidence of remediation efforts in holding that, because contractor "became aware prior to the beginning of the policy period that damage to the [f]looring [s]ystem had occurred or had begun to occur, [it] cannot seek coverage for the [f]looring [f]ailure under the terms of the Ohio [c]asualty [p]olicy"). This, of course, is inconsistent with our well established four corners approach in assessing an insurer's duty to defend. See, e.g., *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 805–806.

[31] We note that there appears to be some division of authority with respect to the application of the known injury exclusion when the insured party was alerted to damage prior to the issuance of the policy, attempted remedial measures to address the problem, and learned later that those remedial measures were unsuccessful. Compare *Essex Ins. Co.* v. *H & H Land Development Corp.*, 525 F. Supp. 2d 1344, 1348 (M.D. Ga. 2007) (denying insurer's motion for summary judgment because there were genuine issues of material

fact as to whether insured contractor's knowledge of property damage on one property was "sufficient to make [it] aware that property damage was occurring" on properties giving rise to claim, and insured "had reason to believe its remedial measures had eliminated the problem of excess runoff"), and *Desert Mountain Properties Ltd. Partnership* v. *Liberty Mutual Fire Ins. Co.*, 225 Ariz. 194, 207–208, 236 P.3d 421 (App. 2010) (holding sufficient evidence that insured contractor "lacked knowledge of the relevant property damage before the policies began" because, although aware of customer complaints about settling houses due to soil compaction made prior to policy period, it believed that those complaints had been resolved and "none of the complaints led [the insured] to believe there was a wide-scale problem with improper soil compaction"), aff'd, 226 Ariz. 419, 250 P.3d 196 (2011), with *Harleysville Mutual Ins. Co.* v. *Dapper, LLC*, United States District Court, Docket No. 2:09CV794 (TFM) (M.D. Ala. July 21, 2010) (The insurer had no duty to defend because it "is undisputed that [the insured] received notice of the . . . property damage [to an adjacent property] directly from [its owner] at least two months before the . . . property was added to the [insurer's] policies. The fact [the insured] thought his remediation efforts would resolve the situation does not belie his knowledge of the damage."). Insofar as the allegations in the underlying complaint do not preclude the imposition of a duty to defend on Netherlands, we need not decide this issue.

[32] We stated: "Historically, the [comprehensive general liability] [policy] has been written on an accident or occurrence basis . . . . According to the express language of the occurrence basis [comprehensive general liability], the insurer is obligated to defend claims and pay for covered bodily injury . . . where the injury is caused by an occurrence and takes place during the policy period.

"Thus, the occurrence-basis policy is geared to paying claims for losses that take place during the policy period and result in a policyholder's legal liability. This means that the time of the negligent acts causing injury (e.g., manufacture of asbestos, failure to warn, dangerous design of a consumer product) is not determinative of the insurer's obligation to defend and pay. Rather, there must be injury from an occurrence during the policy period to trigger occurrence policy coverage. . . .

"Courts have responded to the trigger problem in long latency cases involving occurrence-basis [comprehensive general liability] coverage with four definitions of the trigger of coverage:

"(1) *Manifestation.* These courts hold that an injury subject to a claim occurs when it manifests itself or becomes reasonably capable of diagnosis.

"(2) *Exposure.* These courts hold that a policy is triggered when the claimant is exposed to the alleged cause of the disease regardless of when the injury became manifest or capable of diagnosis.

"(3*) Injury-in-fact or actual injury.* These courts hold that the occurrence giving rise to the third-party claim happens at the time when the body's defenses to the cause of the disease have been overwhelmed so that significant injury has become inevitable.

"(4) *Multiple, Continuous, or Successive trigger.* Under this approach, pioneered by the District of Columbia Circuit in the well-known case of [*Keene Corp.* v. *Ins. Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007, 102 S. Ct. 1644, 71 L. Ed. 2d 875 (1982)] an occurrence has happened whenever the claimant was exposed to the cause of the injury, was injured in fact, or the injury became manifest. Consequently, any of these events trigger the applicable insurance policy in force at the time of the event." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 264 Conn. 697 n.12.

[33] As Travelers accurately observes, in addition to the definition set forth in footnote 12 of that opinion, we mentioned the exposure theory in *Security Ins. Co. of Hartford* only insofar as we discussed the "seminal case setting forth the pro rata method of allocating defense costs"; *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 264 Conn. 706; namely, *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), cert. denied, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d 650 (1981), which we observed in passing had adopted the exposure trigger of coverage. *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 707–708. Nowhere in *Security Ins. Co. of Hartford*, however, did we endorse the exposure trigger of coverage to the exclusion of other triggers; our endorsement of *Forty-Eight Insulations, Inc.*, was limited to that court's policy reasoning for adopting the pro rata method, insofar as the application of the exposure trigger in that case had allowed

for a " 'reasonable means of proration' " because the insured " 'has urged that indemnity costs can be allocated by the number of years that a worker inhaled asbestos fibers. By embracing the exposure theory, we have agreed. There is no reason why this same theory should not apply to defense costs.' " *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 708, quoting *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, supra, 1225. Indeed, in the *very next paragraph* of *Security Ins. Co of Hartford*, we endorsed similar policy reasoning that had been embraced by the New Jersey Supreme Court in its adoption of the pro rata method of apportioning defense costs in *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994), a decision that expressly adopted the continuous trigger theory as well. *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, supra, 708–709.

[34] Specifically, Netherlands claimed that this evidence demonstrated that Travelers "has known that Lombardo received notice of the [law] library water intrusion and resulting property damage from the [state] in 1998 since January 3, 2002, at the latest." Netherlands also claimed that "[Travelers] knew, prior to bringing the present cause of action that the Netherlands' policies do not cover property damage that the insured knew about in whole or in part prior to the inception date of the Netherlands' policies."

[35] To this end, Travelers also filed a motion to exclude irrelevant evidence, seeking to bar the admission of extrinsic evidence on the ground that, under Connecticut law, the only evidence relevant to the trial court's determination with respect to Netherlands' duty to defend is the complaint in the underlying action and the insurance policies. The trial court deferred ruling on Travelers' motion until the evidence at issue was offered.

[36] See footnote 25 of this opinion and the accompanying text.

[37] Our independent review of the transcript demonstrates that the parties and the trial court discussed, in response to Travelers' motion, whether Connecticut law permits the court to go beyond the four corners of the complaint in determining whether a duty to defend exists. Netherlands relied on *Keithan* v. *Massachusetts Bonding & Ins. Co.*, supra, 159 Conn. 128, in support of the propriety of that action. That discussion was, however, limited to the propriety of going beyond a complaint to flesh out broad factual allegations that potentially implicate an insurer's duty to defend, with the trial court agreeing with Travelers that this court's decision in *Keithan* is limited to permitting the court to go beyond the complaint only to establish whether the person sued was actually an insured under the policy at issue. See id., 141–42. Nowhere in the transcript or record does Netherlands raise the insurer specific absolute bar argument it presses on appeal as an extension of *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, supra, 274 Conn. 466–67.

[38] Moreover, to the extent that Netherlands frames this claim as an evidentiary issue, its briefing is inadequate insofar as it "lacks the verbatim statement of the relevant objections and the trial court's ruling thereon required pursuant to Practice Book § 67-4 (d) (3) for appeals of evidentiary rulings. See, e.g., *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 447 n.20, 820 A.2d 258 (2003); see also *Aspiazu* v. *Orgera*, 205 Conn. 623, 636 n.5, 535 A.2d 338 (1987) ('[w]hen raising evidentiary issues on appeal, all briefs should identify clearly what evidence was excluded or admitted, where the trial counsel objected and preserved his rights and why there was error')." *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 51 n.23, 861 A.2d 473 (2004). This is particularly so given Netherlands' failure to provide transcript citations or some other context for the precise evidentiary rulings that are subject to challenge. See *Florian* v. *Lenge*, 91 Conn. App. 268, 286–87, 880 A.2d 985 (2005) (reviewing claim challenging restrictions on cross-examination despite "sparse" brief noncompliant with Practice Book § 67-4 [d] [3] "[b]ecause the defendant, however, gives some indication as to what he sought to pursue and cites to relevant portions of the transcript").